1

2

3

4

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

5

6

7

8
FBC Mortgage, LLC,

9
              Plaintiff,

10
      v.

11
Broker Solutions, Inc., et al.,

12
            Defendants.

Case No.  23-cv-00143-CRB

**ORDER DENYING MOTION FOR TEMPORARY RESTRAINING ORDER**

13
      Plaintiff FBC Mortgage, LLC ("FBC") alleges the misappropriation of its trade

14
secrets by Defendants Broker Solutions, Inc. dba New American Funding ("New

15
American") and by several of FBC's former employees, Brian Skarg ("Skarg"), Amanda

16
Benson ("Benson"), Ryan Gee ("Gee"), and Joshua Savea ("Savea") (collectively,

17
"Defendants" or, as to the last four, the "Employees").  See FAC (dkt. 7).  FBC moves for

18
a Temporary Restraining Order ("TRO") seeking to (1) enjoin Defendants from sharing

19
FBC's trade secrets or contacting FBC's former clients or builders; (2) enjoin the four

20
Employees from communicating with former clients or builders, or violating their

21
contractual obligations under their respective employment agreements; (3) order all

22
Defendants to destroy FBC's trade secrets and to notify FBC's counsel after doing so; and

23
(4) order all Defendants to provide contact information for individuals with whom they

24
shared FBC's trade secrets.  See Mot. (dkt. 25) at 2–3.  For the reasons discussed below,

25
the Court DENIES FBC's motion for a TRO.

26
**I.      BACKGROUND**

27
      Between July 2019 and May 2022, FBC, a company in the mortgage business,

28
employed Skarg, Benson, Gee, and Savea as Mortgage Loan Originators.  See FAC ¶¶1,

3–6.  Pursuant to each employee agreement, FBC entrusted the Employees with its confidential, proprietary, and trade secret information, including without limitation "current and potential client lists; client names, addresses, personally-identifying information, and financial information; pricing and rate information; training and marketing materials; job aids; and supplier, vendor, and referral sources."  Herbon Decl. (dkt. 23) ¶¶ 3–10, Exs. A–D § 12.[1]  Conditioned upon their access to this information, the Employees agreed that they would not, at any time during or after their employment, "disclose or use in any way whatsoever any of such confidential information . . . [or] make any duplicates, copies, or reconstructions of such materials."  Id.  Aside from these non-disclosure agreements, FBC has implemented security controls to maintain the secrecy of its trade secrets, including password protection, dual authentication, and where appropriate, encryption.  Id. ¶ 15.  The nondisclosure of FBC's client information is, according to Dan Herbon, the Chief Information Officer at FBC, "vitally important to [its] business, and FBC would be seriously harmed by a breach of privacy or unauthorized disclosure of client information."  Id. ¶¶ 2, 15.

Between November 11, 2022, and November 16, 2022, the Employees collectively terminated their employment with FBC and began working for New American.  See Means Decl. (dkt. 23) ¶ 40; Bargioni Decl. (dkt. 23) ¶ 9; Iannetta Decl. (dkt. 23) ¶ 6; Herbon Decl. ¶ 33.  By virtue of their employment with FBC, the Employees gained inside knowledge of

---

[1] New American objects to nearly all of the evidence submitted by FBC, including the declarations from Dan Herbon ("Herbon Decl."), John Iannetta ("Iannetta Decl."), Rick Bargioni ("Bargioni Decl."), Gary Means ("Means Decl."), and Eileen Ridley ("Ridley Decl.").  See dkts. 28–31, 35.  "Due to the urgency of obtaining a preliminary injunction at a point when there has been limited factual development, the rules of evidence do not apply strictly to preliminary injunction proceedings."  Herb Reed Enters., LLC v. Florida Entmt. Mgmt., Inc., 736 F.3d 1239, 1250 n.5 (9th Cir. 2013); see also Johnson v. Couturier, 572 F.3d 1067, 1083 (9th Cir. 2009).  Therefore, while the Court will keep the objections in mind, particularly as to foundation, the objections are largely moot.  The Court recognizes that New American contests many of the facts asserted by FBC's witnesses.  Accordingly, New American may raise their objections to FBC's evidence at a later point.  Of course, the Court hopes and expects that both parties will make only those objections that they truly believe are meritorious.  It is not good litigation strategy to lodge meritless objections, nor a good use of anyone's time to sift through them.  See, e.g., Objection to Herbon Decl. (dkt. 30) No. 2 (objecting to Herbon statement about being the CIO of FBC for lack of foundation, improper opinion testimony, hearsay, and relevance).

United States District Court
Northern District of California

FBC's customer lists, its proprietary pricing, concession, rate, and marketing information, and its strategies. See Iannetta Decl. ¶ 7. Evinced by soft credit pulls of nine former FBC clients by the four Employees in their roles at New American, FBC argues that it has lost unique and unquantifiable business opportunities. See Herbon Decl. ¶¶ 33, 35, 37–47 & Exs. P–V; Iannetta Decl. ¶¶ 9–13 & Exs. A–B. For example, FBC argues that Savea used FBC's trade secrets while working for New American. See Herbon Decl. ¶ 37. After terminating his employment with FBC, Savea initiated a soft credit inquiry for a client to evaluate the client's loan eligibility. See id. ¶¶ 37–38, Ex. P. FBC argues that Savea only had access to this client's information "by virtue of [his] employment with FBC and the time, money, effort, and other resources expended by FBC." Id. ¶ 35. FBC points to similar actions taken by Defendants Benson, Skarg, and Gee. See id. ¶¶ 39–47, Exs. Q–V.

Additionally, FBC points to the actions of Defendant Skarg. Before terminating his employment with FBC, Skarg sent himself FBC's proprietary and confidential information, "including without limitation its current and potential client lists, rate information, marketing materials, training materials, job aids, application materials, and information regarding personnel, clients, suppliers, vendors, and referral sources." Herbon Decl. ¶¶ 13–26, 33, Exs. E–N. FBC argues that Skarg sent himself this information to solicit FBC's clients and "undercut FBC from a rate standpoint, providing themselves and [New American] with an unfair competitive advantage." Iannetta Decl. ¶ 7; Mot. at 11. FBC argues that his "near-simultaneous termination of employment with FBC and commencement of employment with [New American]" indicates that Skarg is likely sharing this confidential, proprietary, and trade secret information with the other three Employees. See Mot. at 11; Iannetta Decl. ¶ 6; Means Decl. ¶ 40; Bargioni Decl. ¶ 9.

FBC brought this Motion for Temporary Restraining Order upon learning that Defendants are purportedly using and disclosing FBC's trade secrets in order to poach FBC's preferred lending relationship[2] with the builder Woodside Homes. See Mot. at 1.

---

[2] FBC's "preferred lending relationships" refer to its relationships with builders that provide mortgage lenders like FBC with a "superior visibility among the builder's network

FBC argues that it invested "substantial time, money, and resources into developing a preferred lending relationship with . . . Woodside Homes." See Means Decl. ¶¶ 9–10; Bargioni Decl. ¶¶ 4, 8. FBC further argues that the four Employees would not have had a relationship with Woodside Homes but for their employment with FBC, nor did New American have a preferred lending relationship with Woodside Homes in California. See Means Decl. ¶¶ 12, 15, 41, 44; Bargioni Decl. ¶¶ 5, 8. FBC argues that the Employees are seeking to "poach" its preferred lending relationship with Woodside Homes, as evidenced by correspondence between Woodside Homes and the Employees at their New American email addresses. See Herbon Decl. ¶¶ 28–29, Ex. O; Bargioni Decl. ¶¶ 15–16, Ex. A. One email came to FBC's attention when Herbon conducted a review of FBC's internal email database on June 20, 2023. See Herbon Decl. ¶ 27–29, Ex. O. Stephanie Nunziata, a Mortgage Loan Originator at FBC, forwarded FBC's Director of Operations for the Western Region, Rick Bargioni, another email on June 1, 2023, indicating communication between Woodside Homes and the Employees in their roles at New American. See Bargioni Decl. ¶¶ 15–16, Ex. A

FBC alleges that on December 13, 2022, prior to filing this action, it sent a cease-and-desist letter to New American, accusing it of aiding and abetting the Employees in their breaches, interference with FBC's contractual relationships with the Employees, and violations of law. See Ridley Decl. (dkt. 25) ¶¶ 3–5, Ex. A. That same day, FBC also sent a letter to Skarg, notifying him of his alleged violation of the employee agreement and law. See Ridley Decl. ¶¶ 6–8, Ex. B.

FBC asserts that the Defendants' actions have caused monetary damages of more than $10 million per month in gross sales, and, unless enjoined, will continue to cause immediate irreparable harm to FBC. See Means Decl. ¶ 47; Bargioni Decl. ¶ 12. On January 18, 2023, FBC filed the FAC in this case, bringing 11 causes of action: (1) breach of contract; (2) intentional interference with contractual relationships; (3) breach of

_____

of homebuyers, reputational benefits, a steady stream of qualified leads, decreased transaction costs, and a smoother and faster loan origination process." See Mot. at 7.

United States District Court
Northern District of California

fiduciary duty; (4) aiding and abetting breach of fiduciary duty; (5) intentional interference with prospective economic advantage; (6) negligent interference with prospective economic advantage; (7) violation of the Computer Fraud and Abuse Act, 18 US.C. § 1030; (8) violation of the California Comprehensive Computer Data Access and Fraud Act, California Penal Code § 502; (9) violation of DTSA; (10) violation of CUTSA; and (11) violation of the Unfair Competition Law, Cal. Bus. Prof. Code § 17200, et. seq.  See FAC at 5, 8, 10, 11–13, 16, 18, 20, 22.  FBC seeks: (1) compensatory damages, lost profits, and restitution; (2) punitive damages; (3) pre-judgment and post-judgment interest at the maximum rate allowable under California law; (4) injunctive relief requiring Defendants to refrain from using its trade secrets, confidential and proprietary information, and other documents, and further requiring Defendants to return these things to FBC; (5) reasonable attorneys' fees; and (6) costs of suit.  See id. at "Prayer for Relief."

The TRO requests that the Court: (1) enjoin all Defendants from using or sharing any of FBC's trade secrets and communicating with clients and builders with whom the four Employees had contact while at FBC; (2) enjoin the four Employees from communicating clients and builders with whom they formerly worked while at FBC and restrained them from using many materials obtained at FBC; (3) order each Defendant, within one week of the Court's order, to destroy any of FBC's trade secrets in its possession and communicate to FBC's counsel the completion of such destruction; and (4) order each Defendant within one week of the Court's order, to identify to FBC's counsel the last known contact information in Defendant's possession of any person to whom any Defendants have shared FBC's trade secrets.  See Mot. at 2–3.

## II.    LEGAL STANDARD

A TRO is an "extraordinary remedy" that should be awarded only upon a clear showing that the party is entitled to such relief.  See Winter v. Natural Res. Def. Council, Inc., 555 U.S. 7, 22 (2008).  The party seeking a TRO must establish: (1) a likelihood of success on the merits; (2) a likelihood of irreparable harm absent preliminary relief; (3) that the balance of equities tips in the plaintiff's favor; and (4) that an injunction is in the

United States District Court
Northern District of California

public interest.  See id. at 20.  Alternatively, the moving party must demonstrate that "serious questions going to the merits were raised," that "the balance of hardships tips sharply in the [petitioner's] favor," and that the other two Winter elements are satisfied. All. For the Wild Rockies v. Cottrell, 632 F.3d 1127, 1134–35 (9th Cir. 2011) (quotation omitted).  The "[l]ikelihood of success on the merits 'is the most important Winter factor.'"  Disney Enters., Inc. v. VidAngel, Inc., 869 F.3d 848, 856 (9th Cir. 2017) (quoting Garcia v. Google, Inc., 786 F.3d 733, 740 (9th Cir. 2015)).  Courts may analyze a TRO request using a sliding scale approach through which the elements of the "test are balanced, so that a stronger showing of one element may offset a weaker showing of another."  See Armstrong v. Cnty. of Placer, No. 22:1-cv-00779-KJM-KJN, 2021 WL 2258716 (E.D. Cal. May 3, 2021) (citing All. For the Wild Rockies, 632 F.3d at 1131.).

## III.   DISCUSSION

FBC seeks a TRO based on its trade secret misappropriation and breach of contract claims.  Mot. at 4.  Based on the evidence provided, FBC has not demonstrated that it is likely to succeed on the merits of either claim.  Additionally, while the balance of equities tips in its favor, and an injunction would be in the public interest assuming that Defendants were indeed using FBC's trade secrets, FBC has not adequately demonstrated a likelihood of irreparable harm, which rises and falls here with its likelihood of success on the merits.

### A.   Likelihood of Success on the Merits

FBC argues that is likely to succeed on the merits of both its (1) trade secret misappropriation and (2) breach of contract claims.  See id. at 5.  The Court disagrees, given the evidence presently before it.

#### 1.   Trade Secret Misappropriation

To succeed on the merits of a trade secret misappropriation claim under DTSA and CUTSA,[3] a plaintiff must show that "[a] the plaintiff owned a trade secret; [b] the

___

[3] Courts have routinely analyzed claims under CUTSA and DTSA together because "the elements are substantially similar."  InteliClear, LLC v. ETC Glob. Holdings, Inc., 978 F.3d 653 (9th Cir. 2020); see also Becton, Dickinson & Co. v. Cytek Biosciences Inc., No. 18-CV-00933-MMC, 2018 WL 2298500, at *2 (N.D. Cal. May 21, 2018) ("The elements

6

United States District Court
Northern District of California

1    defendant misappropriated the trade secret; and [c] the defendant's actions damaged the

2    plaintiff." Alta Devices, Inc. v. LG Elecs., Inc., 343 F. Supp. 3d 868, 877 (N.D. Cal.

3    2018); see also 18 U.S.C. § 1839(5)(A); Cal. Civ. Code § 3426.1(b).

### a.    Trade Secret Ownership

5        The first element of a misappropriation of trade secrets claim is demonstrating that

6    the plaintiff owned a trade secret.  See Alta Devices, 343 F. Supp. 3d at 877.  Trade secrets

7    include: "all forms and types of financial, business, scientific, technical, economic, or

8    engineering information, including patterns, plans, compilations, program devices,

9    formulas, designs, prototypes, methods, techniques, processes, procedures, programs, or

10   codes . . ." 18 U.S.C. § 1839(3)(A).[4]  To prove ownership under both DTSA and CUTSA,

11   the holder of the information must show that (1) they have "taken reasonable measures to

12   keep such information secret; and (2) the information derives independent economic value,

13   actual or potential, from not being generally known to, and not being readily ascertainable

14   through proper means by, another person who can obtain economic value from the

15   disclosure or use of the information." 18 U.S.C. § 1839(3)(A); See Cal. Civ. Code §

16   3426.1(d).  Although DTSA requires that the trade secret not be readily ascertainable,

17   CUTSA does not.  See 18 U.S.C. § 1839(3)(B); Cal. Civ. Code § 3426.1(d)(1).  FBC

18   currently falls short on the independent economic value prong.

### i.    Reasonable Steps to Maintain Secrecy

20       FBC made reasonable efforts to maintain the secrecy of its purported trade secrets.

21   FBC entrusted the Employees with its trade secrets under the condition that they refrain

22   from using or disclosing it at any time during or after their employment with FBC.  See

23   Herbon Decl. ¶¶ 3–10, Exs. A–D § 12.  Additionally, FBC has implemented security

24   controls to safeguard its trade secrets and client information, "including, among other

25

26   ───────────────

     of a misappropriation of trade secrets claim under the [DTSA] and [CUTSA] are

27   essentially the same")).
     [4] CUTSA defines trade secrets more narrowly: "information, including a formula, pattern,

28   compilation, program, device, method, technique, or process."  See Cal. Civ. Code §
     3426.1(d).

United States District Court
Northern District of California

things, password protection, dual authentication, and where appropriate, encryption."  Id. ¶ 15.  FBC took reasonable efforts to maintain the secrecy of its trade secrets information. Therefore, to establish ownership of the purported trade secrets, FBC must only demonstrate that the information derives independent economic value from not being generally known.  It has not clearly done so.

**ii.      Independent Economic Value**

FBC's purported trade secrets include: "its current and potential client lists; information regarding its preferred lending relationships with builders; non-public, inside information and know-how related to those client and builder relationships; pricing, rate, and concession information; training and marketing materials; job aids; and supplier, vendor, and referral sources."  See Mot. at 2, 5, 7.

**Client Lists**

FBC argues that its "current and potential client lists" constitute trade secrets under CUTSA and DTSA.  In MAI Sys. Corp. v. Peak Computer, Inc., the Ninth Circuit held that the plaintiff's customer database qualified as a trade secret under CUTSA because (1) it "has potential economic value because it allows a competitor . . . to direct its sales efforts to those potential customers that are already using [plaintiff's products]," and (2) the plaintiff "took reasonable steps to insure the secrecy to this information" by "requir[ing] its employees to sign confidentiality agreements respecting its trade secrets, including the Customer Database."  991 F.2d 511, 521 (9th Cir. 1993).  FBC argues that, like the customer database in MAI, its current and potential client lists similarly derive independent economic value from their secrecy.

> Disclosure of this information would allow a competitor to undercut FBC by directing its sales efforts to FBC's current and potential borrowers. . . [and] allow FBC's competitors to poach FBC's builder relationships, and the associated stream of borrowers, after FBC has invested substantial time, effort, and money into understanding the builder's business needs and fostering a relationship.

Means Decl. ¶ 7.  New American responds that FBC's "laundry list" of purported trade secrets, including FBC's customer lists, are "derived from publicly available sources or

8

1   otherwise are common knowledge to persons in the mortgage lending industry." <u>See</u>

2   Opp'n at 6, 9. For instance, New American argues that certain customer materials that

3   Skarg sent to his personal email between October 25 and November 11, 2022 include

4   either material Skarg had possessed for years prior to working for New American or

5   standard materials that are common knowledge to anyone in the mortgage lending

6   industry. <u>See</u> Skarg Decl. ¶¶ 7–10; Herbon Decl. ¶¶ 13–26, Exs. E–N. Other materials

7   that Skarg sent to his personal email are purportedly ascertainable by accessing what is

8   known as a "Title Farm Report." <u>See</u> Skarg Decl. ¶¶ 5–6. Skarg asserts that the Title

9   Farm Report contains the same information as the customer lists Skarg sent to his personal

10   email, including the name of the buyer that closed on the loan, the mortgage company the

11   buyer closed with, the loan type and interest rate, and the closing date. <u>See</u> <u>id.</u>

12         Courts in this district and California courts are "reluctant to protect customer lists to

13   the extent they embody information which is 'readily ascertainable' through public

14   sources, such as business directories." <u>Marsh & McLennan Agency, LLC v. Teros</u>

15   <u>Advisors, LLC</u>, No. 20-CV-02679-HSG, 2021 WL 4846245, at *4 (N.D. Cal. Aug. 11,

16   2021) (citing <u>Morlife, Inc. v. Perry</u>, 56 Cal. App. 4th 1514, 1521 (1997)). Where the

17   employer has "expended time and effort identifying customers with particular needs or

18   characteristics, courts will prohibit former employees from using this information to

19   capture a share of the market," but "[s]uch lists are to be distinguished from mere identities

20   and locations of customers where anyone could easily identify the entities as potential

21   customers." <u>Marsh</u>, 2021 WL 4846245, at *4 (citing <u>Morlife</u>, 56 Cal. App. 4th at 1521–

22   22). At the motion hearing, FBC reiterated the arguments underlying its motion, arguing

23   that its client lists have value because they do not include public information and that its

24   list of leads is valuable because it gives FBC knowledge of people in need of mortgage

25   services. But FBC did not do enough for the Court to discern whether the customer lists

26   that Skarg sent to his personal email contain publicly accessible information, as New

27   American argues, or information that reflects a culmination of the "substantial time, effort,

28   and money [invested] into understanding the builder's business needs and fostering a

United States District Court
Northern District of California

9

1    relationship," as FBC argues.  See Means Decl. ¶ 7.

2        Because there is not enough information—at this point—to determine that the

3    customer lists are the product of "expended time and effort identifying customers with

4    particular needs or characteristics," FBC has not adequately established that its client lists

5    derives independent economic value, actual or potential, from not being generally known

6    to, and not being readily ascertainable through proper means by, another person who can

7    obtain economic value from its disclosure or use.  See 18 U.S.C. § 1839(3)(A); see also

8    Cal. Civ. Code § 3426.1(d).

9        **Training and Marketing Materials, Other Information and Job Aids**

10       FBC argues that its training and marketing materials, pricing, rate, and concession

11   information, and job aids also constitute trade secrets.  See Mot. at 6.  The California Court

12   of Appeal has held that a plaintiff's marketing materials were trade secrets because they

13   "would be valuable if known by a competitor because it would allow the competitor to

14   predict and counter [plaintiff's] advertising and marketing."  Whyte v. Schlage Lock Co.,

15   101 Cal. App. 4th 1443, 1456 (2002).  Additionally, the Whyte court held that "cost and

16   pricing information not readily known in the industry—information such as the cost of

17   materials, labor, overhead, and profit margins—was [a] trade secret."  Id. at 1455–56

18   (internal citation omitted).

19       Here, FBC argues that its training and marketing materials, pricing, rate, and

20   concession information, and job aids also constitute trade secrets.  See Mot. at 6.  FBC

21   contends that these materials "contain information that is unique to FBC, rather than

22   commonly used, industry-wide formulas."  Means Decl. ¶ 8.  The Court agrees in theory—

23   knowledge of FBC's internal pricing schemes, marketing strategies, and instructional

24   tools, like job aids, might arm its competitors with an unfair advantage over it.  This

25   information could allow FBC's competitors to undercut FBC's prices, pursue its clients,

26   and poach its "hard-fought relationships with its builders."  Id.  FBC argues that the

27   marketing materials include the "Mortgage Checklist" and the "Mortgage Loan Officer

28   Profile" created by FBC's marketing team.  See Herbon Decl. ¶ 19.  Similarly, FBC argues

1    that the material Skarg sent himself also contained "FBC's current pricing, rate, and

2    concession information." See id. ¶ 23.  But FBC provides no more specificity as to its

3    marketing and pricing, rate, and concession information.  Nor does FBC identify any of its

4    "job aids" or "training materials" specifically from the materials Skarg sent to himself,

5    beyond mere conclusory lists containing all its purported trade secrets.  See id. ¶ 14 ("The

6    information taken by Skarg included FBC's proprietary and confidential information,

7    including without limitation its current and potential client lists, rate information,

8    marketing materials, training materials, job aids, application materials, and information

9    regarding personnel, clients, suppliers, vendors, and referral sources.").  Although FBC

10   identifies the "Mortgage Checklist" and the "Mortgage Loan Officer Profile" marketing

11   materials, it does not expand on the economic value of those documents.

12          As with its customer lists, FBC has not provided enough information at this point

13   about these purported trade secrets to establish their independent economic value from not

14   being generally known.

15          **Preferred Lending Relationships**

16          The same applies to FBC's preferred lending relationships with builders.  FBC

17   argues that the economic value of its relationship with builders derives from the substantial

18   time, effort, and money it invests into understanding each builder's business needs,

19   fostering a preferred lender relationship, and retaining those relationships once they are

20   established.  See Means Decl. ¶¶ 5–6; Bargioni Decl. ¶ 3.  FBC's preferred lender

21   relationships afford it increased visibility among the builder's network of homebuyers, "a

22   steady stream" of qualified leads, decreased transaction costs, and a smoother and faster

23   loan origination process, all of which lead to a continuous flow of increased loan volume.

24   See Means Decl. ¶¶ 2–6.

25          New American argues that FBC's preferred lender relationships with builders

26   cannot constitute trade secrets, as the "alleged effort and expenditure of [a] resource alone

27   is [not] enough to invoke trade secret protection."  See Opp'n at 11.  New American also

28   points to the Declaration by Skarg, which states that "preferred lender status is common

United States District Court
Northern District of California

1    knowledge."  See Skarg Decl. ¶ 15.  Indeed, FBC does not provide sufficient evidence,

2    beyond conclusory statements, to overcome New American's argument that FBC's

3    preferred lender relationships are common knowledge.  See id.; 18 U.S.C. § 1839(3)(A);

4    Cal. Civ. Code § 3426.1(d).  FBC merely states that their independent economic value

5    stems from the "substantial time, effort, and money" invested into understanding each

6    builder's needs.  See Mot. at 6.  Accordingly, FBC has not adequately demonstrated that

7    its preferred relationships with builders derive independent economic value from not being

8    generally known.

9            **Supplier, Vendor, and Referral Sources**

10           Finally, FBC has failed to establish why "its supplier, vendor, and referral sources"

11   derive independent economic value from their secrecy.  See Mot. at 5, 7.  Aside from

12   contending at the motion hearing that FBC's supplier, vendor, and referral sources were

13   among the materials Skarg downloaded, FBC has not sufficiently established the

14   independent economic value of these materials.  On the one hand, this information is broad

15   enough that it could potentially be analogized to customer lists or marketing materials,

16   which can be trade secrets under federal and California common law.  See Whyte, 101 Cal.

17   App. 4th at 1456 (holding that marketing materials, along with cost and pricing

18   information, was a trade secret); MAI Sys. Corp., 991 F.2d at 521 (holding that customer

19   database information qualified as a trade secret).  On the other hand, FBC pleads the

20   distinct misappropriation of this information alongside its customer lists and marketing

21   materials.  See id.  FBC has provided no information suggesting the independent economic

22   value of its supplier, vendor, and referral sources, nor any authorities that could lead the

23   Court to hold that their value is implied.

24           In sum, FBC has not provided enough evidence to counter New American's

25   arguments that FBC's purported trade secrets contain no information beyond common

26   knowledge.  As such, it has not adequately established the independent economic value of

27   its trade secrets.  Therefore, FBC's trade secrets misappropriation claim would likely not

28   succeed on the merits based on the evidence FBC relies on in the Motion.

1  Even if FBC were to establish the independent economic value of its purported
2  trade secrets, it would still need to satisfy the other elements of a trade secret
3  misappropriation claim.  For the reasons discussed below, FBC has not done so.

**b.     Misappropriation of Trade Secrets**

4
5  The second element of a trade secret misappropriation claim requires demonstrating
6  that the defendant misappropriated a trade secret.  See Alta Devices, 343 F. Supp. 3d at
7  877.  DTSA and CUTSA, in their relevant portions, define the misappropriation of a trade
8  secret as (1) the acquisition of data through improper means; or (2) the unauthorized
9  disclosure or use of another's trade secret by a person who knew or had reason to know
10  that the knowledge of the trade secret was acquired under circumstances giving rise to a
11  duty to maintain its secrecy.  See 18 U.S.C. § 1839(5); Cal. Civ. Code § 3426.1(b).
12  Although FBC notes the existence of both prongs in the TRO, it argues that it is likely to
13  succeed on the merits of its trade secrets misappropriation claim based only on the second
14  prong.  See Mot. at 7 ("One alternative requires acquisition through improper means . . .
15  but a second, independent theory of misappropriation requires only that the trade secret be
16  acquired under circumstances giving rise to a duty to maintain the secrecy of the trade
17  secret or limit the use of the trade secret . . . and then disclosed or used by someone who
18  knew or had reason to know about the circumstances of acquisition"); id. at 7–9 (only
19  discussing second prong).  Therefore, this Order only addresses the second prong.  FBC
20  contends that: (i) the Employees and New American disclosed or used FBC's trade secrets;
21  (ii) the Employees legitimately acquired the trade secrets under a duty to maintain their
22  secrecy; and (iii) all Defendants knew or should have known of this duty.

**i.     Disclosure or Use of Trade Secret**

23
24  FBC would likely not succeed in demonstrating the disclosure or use of its trade
25  secrets.  FBC has failed to demonstrate how the Defendants misappropriated its customer
26  lists, information regarding its preferred lending relationships with builders, pricing and
27  rate information, training and marketing materials, and job aids.

28  **Savea, Benson, Skarg, and Gee Credit Pulls**

United States District Court
Northern District of California

1    FBC argues that the four Employees took FBC's client lists and builder information

2    to their new place of employment at New American, and together with New American,

3    "used or disclosed FBC's trade secrets to begin servicing FBC's current and potential

4    clients and builder accounts."  See Mot. at 9.  For example, after terminating employment

5    with FBC, Savea initiated a credit inquiry for a client to evaluate the client's loan

6    eligibility.  See Herbon Decl. ¶¶ 37, 38 Ex. P.  FBC argues that Savea only had access to

7    this client's information "by virtue of [his] employment with FBC and the time, money,

8    effort, and other resources expended by FBC."  Id. ¶ 30.  FBC points to similar actions

9    taken by Defendants Benson, Skarg, and Gee.  See id. ¶ 39–47, Exs. Q–V.  At the motion

10    hearing, FBC argued that exhibits Q–V from the Herbon Declaration, evincing New

11    American's servicing of former FBC clients, were clear examples of misappropriation.

12    FBC argued that the Defendants would not have had knowledge of the specific clients but

13    for FBC.  But FBC fails to persuade the Court that knowledge of clients, or even

14    relationships with clients, are trade secrets.  FBC fails to establish adequately that the

15    Defendants are using or disclosing FBC's trade secrets.

16    New American argues that these soft credit reports are speculative and are not

17    sufficient grounds for misappropriation.  See Opp'n at 12, 17; Skarg Decl. ¶ 3.  Moreover,

18    New American argues that there is no evidence ruling out the possibility that the clients

19    initiated communicated with the Employees in their roles at New American.  See Opp'n at

20    12.  The Court agrees.  Although this evidence might suggest dubious behavior by the

21    Employees, it does not demonstrate explicit "use or disclosure" of FBC's trade secrets

22    necessary to succeed on the merits of a trade secrets misappropriation claim.  FBC's

23    argument is too speculative.

24    **Skarg Emails Containing FBC Documents**

25    FBC further argues that Skarg misappropriated FBC's "current and potential client

26    lists, rate information, marketing materials, training materials, job aids, application

27    materials, and information regarding personnel, clients, suppliers, vendors, and referral

28    sources."  See Mot. at 10.  Just before terminating his employment with FBC, Skarg sent

14

FBC's "confidential" and "not publicly available" documents to his personal email address, including what appears to be spreadsheets tracking current and prospective clients, checklists, fillable forms, links to Google Docs, FBC rates, formulas, Skarg's own biography and headshot, and an email template. See Herbon Decl. ¶¶ 13–26, Exs. E–N. FBC argues that Skarg sent himself this information to "solicit FBC's clients and undercut FBC from a rate standpoint, providing themselves and [New American] with an unfair competitive advantage." See Mot. at 11; Iannetta Decl. ¶ 7. At the hearing, FBC pointed to exhibits A and B from the Iannetta Declaration as evidence that Skarg and New American were using FBC's pricing information and relationships to undercut FBC. This, combined with exhibits E–N, FBC argues, is sufficient proof that Skarg and New American are using FBC's pricing information and relationships based on Skarg's history with those clients. Although this evidence shows that Skarg may be servicing former FBC clients, it does not show that Skarg used or disclosed FBC's trade secrets—as apart from his own knowledge of those clients—in servicing these clients. There is nothing in Iannetta exhibits A and B about pricing information, nor do those exhibits rule out the possibility that the clients contacted Skarg first. Additionally, as New American argues, FBC has not demonstrated that its relationships are trade secrets. The alleged effort and expenditure of a resource alone does not render independent economic value, and the relationships themselves may be common knowledge.

FBC has not established that Skarg explicitly used or disclosed this information to New American. FBC speculates that:

> the only reason that Skarg would have sent himself FBC's confidential, proprietary, and trade secret information is to use this inside knowledge to solicit FBC's clients and builder relationships, and undercut FBC from a rate standpoint, providing himself and his new employer with an unfair competitive advantage.

Mot. at 11. However, the best evidence that FBC points to in support of such an allegation is a statement from John Iannetta, an FBC Area Manager, that, by virtue of having worked for FBC, the Employees gained inside knowledge of FBC's pricing, concession, rate, and

marketing materials.  See Iannetta Decl. ¶ 7.  This, in turn, allows the Employees to "solicit FBC's clients and undercut FBC from a rate standpoint, providing themselves and [New American] with an unfair competitive advantage."  Id.  But again, FBC does not provide evidence demonstrating that Skarg actually used the materials he sent to himself or that he disclosed them to New American.  The Court would have to speculate to accept FBC's interpretation.

**Woodside Homes Preferred Lender Relationship**

Finally, FBC argues that the four Employees are "now using or disclosing FBC's builder relationships, pricing and rate information, training and marketing materials, and job aids to undercut and poach FBC's preferred lending relationship with Woodside Homes."  See Mot. at 10; Herbon Decl. ¶ 29, Ex. O; Bargioni Decl. ¶¶ 15–16, Ex. A.  FBC further argues that the four Employees would not have had a relationship with Woodside Homes but for their employment with FBC, nor did New American have a preferred lending relationship with Woodside Homes in California until the Employees poached FBC's relationship with Woodside Homes upon terminating employment with FBC and joining New American.  See Means Decl. ¶¶ 12, 15, 41, 44, 46; Bargioni Decl. ¶¶ 5, 8.  FBC argues that the Employees are seeking to "poach" FBC's preferred lending relationship with Woodside Homes, as evidenced by correspondence between Woodside Homes and the Employees at their New American email addresses.  See Herbon Decl. ¶ 29, Ex. O; Bargioni Decl. ¶¶ 15–16, Ex. A.  However, FBC provides no evidence to show explicit use or disclosure by Defendants, beyond its contention that because the Employees only worked with Woodside Homes "by virtue of their employment with FBC," their engagement with Woodside Homes while at New American "strongly suggests" trade secret misappropriation.  See Herbon Decl. ¶ 28.

FBC's evidence does not demonstrate trade secret use or misappropriation beyond speculation.  And FBC fails to persuade the Court that a relationship is a trade secret. Based on the evidence before the Court now, FBC has not demonstrated that the Defendants used or misappropriated its purported trade secrets.

16

1
2
3
4
5
6
7
8
9
10
11

12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

### ii.   Acquisition Under Duty to Maintain Secrecy

FBC can easily meet the last two elements of misappropriation.  The four Employees, as former Mortgage Loan Originators at FBC, clearly acquired FBC's trade secrets under a duty to maintain their secrecy.  See Herbon Decl. ¶¶ 3–10 Exs. A–D § 12.  The Employees each signed an Employment Agreement in which they expressly agreed that they would have access to FBC's "Confidential Information, Trade Secrets, and Proprietary Information" under the condition that they would not disclose or use them during or after their employment.  Id.  The Employment Agreement contractually obligated the Employees to refrain from using or disclosing FBC's trade secrets.

### iii.   Knowledge or Reason to Know

Additionally, all Defendants knew or had reason to know that they acquired FBC's trade secrets under circumstances giving rise to a duty to maintain their secrecy.  The four Employees were on notice for the very same reason that they had a duty to maintain the secrecy of the trade secrets—because they expressly agreed to this duty under their Employment Agreements.  See Herbon Decl. ¶¶ 3–10 Exs. A–D § 12.  As for New American, FBC sent a cease-and-desist letter to the organization on December 13, 2022 as a "formal notice [that it] believes. . . Brian Skarg, has taken FBC's proprietary and confidential information to his new position at New American Funding, in violation of his FBC Employment Agreement and U.S. law. . . [and] demands that [New American] immediately cease and desist the use and dissemination of its documents, proprietary and confidential information, and trade secrets."  Ridley Decl. at Exs. A–B.  All Defendants had reason to know that the Employees acquired FBC's trade secrets under a duty to maintain their secrecy.

Because on this record, FBC has not demonstrated Defendants' unauthorized disclosure or use of its trade secret beyond mere speculation, it is not likely to succeed in demonstrating the misappropriation of its trade secrets.

Therefore, the Court need not reach the issue of whether FBC properly established damages as a result of the Defendants' misappropriation, the final element of a

1    misappropriation claim.  See Alta Devices, 343 F. Supp. 3d at 877.

2                      **2.**        **Breach of Contract**

3           FBC next argues that it is likely to succeed on the merits of its breach of contract

4    claim, in which it argues that the Employees breached the non-solicitation and non-

5    disclosure obligations laid out in the employee agreements.  See Mot. at 12–15.  FBC

6    argues that the breach of contract claim is governed by Florida law.[5]  See id. at 12.  To

7    prove a breach of contract under Florida law, a plaintiff must show (1) a valid contract, (2)

8    a material breach of that contract, and (3) damages resulting from the breach.  See JF &

9    LN, LLC v. Royal Oldsmobile-GMC Trucks Co., 292 So. 3d 500, 508 (Fla. Dist. Ct. App.

10   2020).  Based on the record currently before the Court, FBC does not appear likely to

11   succeed on the breach of contract claim.

12          FBC argues that the Employees breached both (a) the non-disclosure clause and (b)

13   the non-solicitation clause of their employment agreements.  See Mot. at 12–13.

14                      **a.**        **Non-disclosure clause**

15          FBC argues that in their respective employment agreements, the Employees

16   expressly agreed that they would have access to FBC's confidential information, trade

17   secrets, and proprietary information under the condition they not, at any time during or

18   after their employment, "disclose or use in any way whatsoever any of such confidential

19   information."  See Herbon Decl. ¶¶ 3–10 Exs. A–D § 12.  FBC argues that the employees

20   breached this clause when they began servicing clients while employed at New American.

21   See Mot. at 17.  Similarly, FBC argues that the Employees breached this clause through

22   their efforts to "poach FBC's relationships with the builder Woodside Homes."  See id.

23   FBC argues that, in their effort to poach FBC's relationships with Woodside Homes, the

24   Employees also used, disclosed, or duplicated FBC's trade secret information.  See Means

25   Decl. ¶¶ 40–47; Bargioni Decl. ¶¶ 14–18.

26

27   ───────────────

28   [5] The parties disagree about whether Florida or California law governs.  See Opp'n at 12–13.  The Court need not reach the choice of law question, as the result would be the same under either state's law.

United States District Court
Northern District of California

But the only concrete evidence that FBC points to in support of this argument is an email from a Woodside Homes employee to the Employees in their capacities at New American.  See Bargioni Decl. ¶ 15–16, Ex. A.  In the email, a Woodside Homes employee stated that she was leaving the company and passing her work on to her successor.  See id. ¶ 16, Ex. A.  The Woodside Homes employee included several FBC employees on the email, as well as Defendants Savea, Skarg, and Benson in their roles at New American.  See id.  As noted above, although FBC provides evidence that might suggest the use or misappropriation of FBC's customer/client lists by Savea, Gee, and Benson, FBC does not explicitly demonstrate trade secret use or misappropriation beyond speculation.  As such, FBC is not likely to prevail on the merits of its breach of contract claim as to the non-disclosure clause.

### b.   Non-solicitation clause

FBC argues next that in their respective employment agreements, the Employees expressly agreed that they would not:

> (a) solicit for employment by Employee, or anyone else, or employ any employee of FBC or any person who was an employee of FBC within 12 months prior to such solicitation; (b) induce, or attempt to induce, any employee of FBC to terminate such employee's employment; (c) induce, or attempt to induce, anyone having a business relationship with FBC to terminate or curtail such relationship or, on behalf of himself or anyone else, compete with FBC…

See Herbon Decl. ¶¶ 3–10 Exs. A–D § 14.  FBC argues that the Employees also breached their non-solicitation agreements by soliciting and inducing: (1) FBC's employees to terminate employment with FBC; and (2) FBC's clients and builder accounts, including Woodside Homes, to terminate their business relationships with FBC.  See Mot. at 15.  FBC argues that "[a]cting as a group, the [Employees] terminated employment with FBC and began employment with [New American]."  Means Decl. ¶ 40; see also Iannetta Decl. ¶ 6; Bargioni Decl. ¶ 9.  FBC therefore concludes that "[t]he timing and the near-simultaneous resignation of employment with FBC and commencement of employment with [New American] indicates that this was a concerted group decision that had been

negotiated in advance, rather than a series of individual decisions." See Mot. at 16; Means Decl. ¶ 40; Iannetta Decl. ¶ 6; Bargioni Decl. ¶ 9.

However, as New American argues, nothing in these declarations establishes coordinated effort to leave FBC for New American. See Opp'n at 16. Similarly, as noted above, FBC provides no evidence, beyond mere speculation, that FBC solicited clients and builder accounts, like Woodside Homes. As such, FBC is not likely to prevail on the merits of its breach of contract claim as to the non-solicitation clauses.

In sum, based on the evidence now before the Court, FBC is not likely to prevail on the merits of its breach of contract claim, and this Court need not reach the issue of damages allegedly suffered from the breach.

## B.    Irreparable Harm

A TRO is not warranted absent a showing that "irreparable injury is likely in the absence of an injunction." Winter, 555 U.S. at 22. A party claiming irreparable harm must establish that remedies available at law, such as monetary damages, are inadequate to compensate them for their harm. See Herb Reed Enter., LLC v. Fla. Ent. Mgmt., Inc., 736 F.3d 1239, 1249–1250 (9th Cir. 2013). The Ninth Circuit has held that, although "economic injury alone does not support a finding of irreparable harm. . . intangible injuries, such as damage to ongoing recruitment efforts and goodwill, qualify as irreparable harm. Rent-A-Ctr., Inc. v. Canyon Television & Appliance Rental, Inc., 944 F.2d 597, 603 (9th Cir. 1991). A showing that the opposing party intends "to make imminent or continued use of a trade secret," however, "will almost always certainly show irreparable harm." Pac. Aerospace & Elec., Inc. v. Taylor, 295 F. Supp. 2d 1188, 1198 (E.D. Wash. 2003) (internal citations omitted).

FBC advances several arguments in support of its claim of irreparable harm, focusing specifically on its preferred lender relationships with builders like Woodside Homes. First, FBC argues that absent an injunction enjoining Defendants from continuing to use or disclose its trade secrets, FBC will "suffer harm to its reputation, goodwill, market share, and competitive position in the mortgage lending industry. . . [that it] has

1   spent substantial time, money, and resources developing."  See Mot. at 19; Herbon Decl. ¶

2   49.  FBC argues that it has earned its competitive position through the substantial time,

3   effort, and money it has invested into its relationships with builders.  See Means Decl. ¶¶

4   2–6.  Absent an injunction, FBC maintains, Defendants will continue to use or disclose

5   these relationships.  See Mot. at 19.  Second, FBC argues that it "cannot reasonably

6   calculate the damage to its goodwill and competitive position in the marketplace if

7   Defendants are allowed to misappropriate its trade secrets."  Id.  Because builder

8   relationships often lead to a "a steady stream of qualified leads and increased loan

9   volume," it will be exceedingly difficult for FBC to calculate its damages.  See id.; Means

10  Decl. ¶¶ 2–6.

11       In sum, FBC argues that it faces irreparable harm because the Defendants will

12  continue to use and disclose its trade secrets.  But because FBC has not demonstrated

13  enough at this point to succeed on the merits of its trade secrets misappropriation claim, it

14  has not sufficiently demonstrated that irreparable injury is likely in the absence of an

15  injunction.

16       **C.     Balance of Harm and Public Interest**

17       The remaining Winter factors are balance of hardships and the public interest.

18            **1.     Balance of Harms**

19       In weighing the balance of hardships, the Court must consider the seriousness of the

20  possible injuries that could result to either side if the Court grants or denies the requested

21  relief.  See Winter, 555 U.S. at 26.  Here, the balance of harms weighs heavily in FBC's

22  favor.  FBC's proposed TRO would: (1) enjoin all Defendants from using or sharing any of

23  FBC's trade secrets and communicating with clients and builders with whom the four

24  Employees had contact while at FBC; (2) enjoin the four Employees from communicating

25  clients and builders with whom they formerly worked while at FBC and restrained them

26  from using many materials obtained at FBC; (3) order each Defendant, within one week of

27  the Court's order, to destroy any of FBC's trade secrets in its possession and communicate

28  to FBC's counsel the completion of such destruction; and (4) order each Defendant within

1   one week of the Court's order, to identify to FBC's counsel the last known contact

2   information in Defendant's possession of any person to whom any Defendants have shared

3   FBC's trade secrets.  See Mot. at 2–3, 21–22.

4   FBC argues that it will be harmed absent an injunction enjoining Defendants from

5   using FBC's trade secrets and communicating with former FBC clients and builders and

6   ordering them to destroy FBC's purported trade secrets.  See id. at 20.  By contrast, FBC's

7   requested injunction would not be overly burdensome to any of the Defendants.  In theory,

8   an injunction restraining the Defendants from using and disclosing FBC's trade secrets and

9   communicating with FBC clients and builders would not impose any hardship on them.

10  Therefore, the balance of hardships favors FBC.

## 2.   Public Interest

12  As for the public interest, the Court may only grant a TRO if "the public interests"

13  that favor granting it "outweigh other public interests that cut in favor of not issuing" it.

14  Alliance for the Wild Rockies, 632 F.3d at 1138.  Here, FBC argues that entry of its

15  requested TRO would not be adverse to the public interest.  See Mot. at 20–21.  The public

16  has a strong interest in protecting trade secrets and enforcing compliance with contracts

17  into which individuals freely entered.  See Henry Schein, Inc. v. Cook, 191 F. Supp. 3d

18  1072, 1078 (N.D. Cal. 2016) ("[T]he public interest is served when defendant is asked to

19  do no more than abide by trade laws and the obligations of contractual agreements signed

20  with her employer"); Comet Techs. United States of Am. Inc. v. Beuerman, No. 18-CV-

21  01441-LHK, 2018 WL 1990226, at *5 (N.D. Cal. Mar. 15, 2018) ("[T]he public has a

22  strong interest in ensuring trade secrets are protected").  Though California has a strong

23  public policy in favor of vigorous competition, that interest "yields to California's interest

24  in protecting a company's trade secrets."  Bank of Am., N.A. v. Lee, No. CV 08-5546

25  CAS(JWJX), 2008 WL 4351348, at *7 (C.D. Cal. Sept. 22, 2008).  Here, the public

26  interest would weigh in FBC's favor, if FBC's trade secrets were in fact in danger.

## IV.   CONCLUSION

27  Based on the evidence now before the Court, FBC is not likely to succeed on the

merits of its trade secrets misappropriation or breach of contract claim, and therefore has also failed to demonstrate irreparable harm.  Accordingly, the Court DENIES the motion for a TRO.

**IT IS SO ORDERED.**

Dated: August _1_, 2023

CHARLES R. BREYER
United States District Judge